—————————————————————————
)
KIMBERLY SHEPPARD,                    )
)
Plaintiff,            )
)          Civil Action
v.                                    )          No. 16-11514-PBS
)
265 ESSEX STREET OPERATING COMPANY,)
LLC, HEALTHBRIDGE MANAGEMENT          )
COMPANY, FRANK SILVIA, and BETH       )
FEARON,                               )
Defendants.       )
—————————————————————————)


**MEMORANDUM AND ORDER**

March 14, 2018

Saris, C.J.


**INTRODUCTION**

Plaintiff Kimberly Sheppard was fired by Defendant 265 Essex Street Operating Company, LLC ("Essex") on January 5, 2015. She brought this action against Essex, two of her former supervisors, Frank Silvia and Beth Fearon, and HealthBridge Management Company.[1] See Docket No. 8 at 1.

In her original complaint, Sheppard alleged she was wrongfully terminated in violation of public policy --

_____

[1] Almost two full years into the case, there is no indication that Fearon, Silvia, or HealthBridge Management Company have been served. For this reason, all claims against those parties are dismissed.

specifically, in retaliation for her internal complaints of ongoing Medicaid fraud. She also brought a promissory estoppel claim, alleging that she accepted employment in reliance on a promise by Essex that she could work a flexible schedule, and that two years later that promise was violated. Essex moved for summary judgment on both counts, arguing that (1) a retaliation claim over reports of Medicaid fraud must be brought under the Massachusetts False Claims Act ("MFCA"), not as a common-law wrongful termination claim; and (2) an at-will employee is not indefinitely entitled to a flexible schedule, notwithstanding accommodations for two years. Docket No. 49 at 1–2.

This Court granted Essex's motion for summary judgment (Docket No. 49) on September 18, 2017, as to the promissory estoppel count, and deferred on the retaliation count, "pending plaintiff's decision on whether to file a motion to amend" under the MFCA. Docket No. 59.

On September 25, 2017, Sheppard filed a motion for leave to amend her complaint (Docket No. 61). She included with her motion a proposed amended complaint. See Docket No. 61-1. In her proposed amended complaint, Sheppard alleges that Essex violated several specific provisions of the MFCA, including Sections 5B(1), 5B(2), and 5B(8), and brings her action "on behalf of the Commonwealth of Massachusetts" as permitted by Mass. Gen. Laws ch. 12, § 5C(2). Docket No. 61-1 ¶ 49. Sheppard also alleges her

termination was wrongful and "in violation and retaliation of [the] False Claims Act," without citing Section 5J of the MFCA, which deals with individual retaliation actions. Docket No. 61-1 ¶ 55.

The motion to amend (Docket No. 61) is **ALLOWED IN PART** and **DENIED IN PART**, and the motion for summary judgment (Docket No. 49) is **DENIED AS MOOT** as to the common-law claim of wrongful termination.

## **FACTUAL BACKGROUND**

The relevant factual background is taken from the summary judgment record, as the Court must consider the record when a motion to amend is filed at this stage of litigation. See Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994). The facts are not in dispute except where stated.

In June 2012, Sheppard began working at Essex, a skilled nursing facility, as a Minimum Data Set ("MDS") Coordinator on an at-will basis. See Docket No. 51-3 at 2. As an MDS Coordinator, Sheppard's employment duties included "reporting missing documentation on [Certified Nursing Assistant] flow sheets, nursing treatment sheets as well as reporting missing documentation and errors that occur in the care plans, and other required MDS documentation." Docket No. 55 at 9; accord Docket No. 51 ¶ 15. The Wage and Benefits Summary, which she signed, noted that all employee wages, benefits, and other working

conditions would be subject to change at any time at Essex's sole discretion. See Docket No. 51-3 at 2. Sheppard understood that, as an at-will employee, she could be terminated at any time, for any reason, with or without notice, and that the terms and conditions of her employment were subject to change at any time. Sheppard Dep. at 48:7-52:1.

Things heated up in the fall of 2014. In early fall 2014, Sheppard was asked to, and did, perform the job duties and responsibilities of a Management Minutes Questionnaire ("MMQ") Coordinator because the position was vacant. Docket No. 51-1 ¶ 11. Sheppard's Performance Appraisal, dated October 13, 2014, says that "[Sheppard] is taking on the role of MMQ," Docket No. 51-8 at 1, but Sheppard disputes that she actually accepted the position of MMQ Coordinator, which dealt with Medicaid reimbursements, Sheppard Dep. at 112:21-113:22; Docket No. 51-1 ¶ 12.

In October or November of 2014, Sheppard told Darlene Morris, the regional clinical reimbursement specialist, that she would not participate in Morris's "upscoring" of patients. Sheppard Dep. at 56:2-20. Upscoring "means to change the criteria of the MDS/MMQ reports so that a patient appears to need more services and [Essex] will be eligible for additional funding." Docket No. 51-5 at 13. Additionally, in an email from Stephen Hopkins, a medical records clerk, to Silvia, the

administrator, dated October 31, 2014, Hopkins wrote that
Sheppard "said that [Morris] has been going through the Medicaid
charts and taking out documents that conflict with nursing as
far as reimbursement so she doesn't lose points on the audit."
Docket No. 51-13. At some point in time, Marcie Zarella, the
regional director of clinical reimbursement, told Sheppard not
to put any of her findings in an email because Essex was being
audited by the Massachusetts Attorney General's Office for
Medicaid fraud. Docket No. 51-5 at 17. Based on that directive,
Sheppard entered her findings in a Word document, which she gave
to her supervisors. Docket No. 51-5 at 17.

On October 13, 2014, Sheppard received a positive
performance review for her job as MDS Coordinator. Docket No.
51-8. But, around the same time, Morris shared concerns with
Zarella about Sheppard's performance. Docket No. 51-1 ¶ 16. On
November 18, 2014, Essex presented Sheppard with a Performance
Warning and Plan for Improvement ("PIP"), Docket No. 51-1 ¶ 20,
which she did not sign because she disagreed with the way Essex
characterized her responsibilities with respect to the MMQ
project, Sheppard Dep. at 111:4-113:22. Sheppard's PIP expressly
states that her failure to immediately improve her performance
could lead to termination. Docket No. 51-9 at 2.

On November 30, 2014, the biannual internal audit of the
MMQ documentation conducted by Morris revealed numerous

deficiencies, which Sheppard failed to report, as required by the PIP. Docket No. 51-1 ¶ 22. Sheppard was then "re-educated on the process for completing and correcting the monthly nursing summaries." Docket No. 51-1 ¶ 23. The audit further showed that, on December 3, 2014, Sheppard had not completed her required tasks. Docket No. 51-1 ¶ 24.

Sheppard was suspended pending investigation on December 5, 2014. Docket No. 51-10. The reason indicated on the form was "Performance," and her job title as listed on the suspension form was "MMQ Coordinator." Docket No. 51-10.

On December 8, 2014, Sheppard wrote a letter to Essex disputing her suspension and arguing she had been unfairly suspended. Docket No. 51-11 at 1. In the letter, Sheppard indicated that Essex retaliated against her "because [she] would not agree to the 'overscoring' of certain residents." Docket No. 51-11 at 2. She also wrote that she had "been told to 'look away' while [Morris] marked up a nursing summary." Docket No. 51-11 at 2.

Upon receiving the letter, Zarella and Robert Clark undertook an investigation into Sheppard's allegations of fraudulent conduct by Morris. Docket No. 51-1 ¶ 29. Essex's investigation revealed no support for Sheppard's allegations. See Docket No. 51-1 ¶ 34.

Sheppard's employment was terminated on January 5, 2015.
See Docket No. 51-14. The proffered reason for the termination
was her "failure to meet expected performance standards." Docket
No. 51-14. Sheppard maintains, however, that she was terminated
in retaliation for reporting Morris's alleged Medicaid
reimbursement manipulation. See Docket No. 51-5 at 17.

## LEGAL STANDARD

Courts "should freely give leave [to amend pleadings] when
justice so requires." Fed. R. Civ. P. 15(a)(2). However, courts
may deny leave to amend for several reasons, including "futility
of amendment." United States ex rel. Gagne v. City of Worcester,
565 F.3d 40, 48 (1st Cir. 2009); accord Foman v. Davis, 371 U.S.
178, 182 (1962) (motion for leave to amend may be denied where
there is "undue delay, bad faith or dilatory motive on the part
of the movant, repeated failure to cure deficiencies by
amendments previously allowed, undue prejudice to the opposing
party by virtue of allowance of the amendment, futility of
amendment, etc.").

If a plaintiff seeks leave to amend a complaint prior to
the close of discovery, courts apply the motion to dismiss
standard of Fed. R. Civ. P. 12(b)(6) to decide whether amendment
would be futile. Hatch v. Dep't for Children, Youth & Their
Families, 274 F.3d 12, 19 (1st Cir. 2001). However, when leave
to amend a complaint is sought after discovery is complete and a

party has already moved for summary judgment, a plaintiff must meet a more rigorous standard. See id. (citing Resolution Trust Corp., 30 F.3d at 253) (stating that, in that situation, "the proposed amendment must be not only theoretically viable but also solidly grounded in the record"). Here, since the discovery deadlines have passed, and there is a motion for summary judgment on the docket, Sheppard's amendments will be deemed futile "unless the allegations of the proposed amended complaint are supported by substantial evidence." Id. (citing Resolution Trust Corp., 30 F.3d at 253).

## DISCUSSION

### I.  Qui Tam Claim

A qui tam action on behalf of the Commonwealth of Massachusetts alleging violations of the MFCA must meet the special pleading requirements of Fed. R. Civ. P. 9(b). See Lawton ex rel. United States v. Takeda Pharm. Co., 842 F.3d 125, 132 (1st Cir. 2016) ("Rule 9(b)'s heightened pleading standard generally applies to state law fraud claims brought in federal court."). That rule requires parties alleging fraud in a complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In the context of a qui tam action, the relator "must specify the 'time, place, and content of an alleged false representation.'" United States v. Univ. of Mass., Worcester, 80 F. Supp. 3d 296, 302 (D. Mass.

2015) (quoting Gagne, 565 F.3d at 45). Despite these requirements, there is some "flexibility for relators to leave some questions unanswered," so long as the complaint demonstrates sufficient particularity overall. Id. at 303.

Essex argues Sheppard's motion to amend is futile because Sheppard has not met the particularity requirement of Rule 9(b) for a qui tam action. The Court agrees. Sheppard has failed to identify which employees or types of employees at Essex actually filed false claims against the government, the content of such claims, when such claims were filed, the patients involved, or how much money was falsely claimed -- all of which are required elements when a plaintiff asserts that a defendant submitted false claims. See id. at 302-03. Even when Sheppard is granted the "flexibility . . . to leave some questions unanswered," her proposed amended complaint is not pleaded with sufficient particularity.

Moreover, a qui tam action also must comply with the procedural requirements of the MFCA: a plaintiff must file her complaint under seal and must serve the Attorney General. Mass. Gen. Laws ch. 12, § 5C(3). In this case, Sheppard did not fulfill either procedural prerequisite.

Sheppard's proposed amended complaint satisfies neither Fed. R. Civ. P. 9(b) nor the procedural requirements of Mass. Gen. Laws ch. 12, § 5C(3). Accordingly, she may not amend her

complaint to bring a qui tam action on behalf of the Commonwealth.

## II.  **Individual Retaliation Claim**

Sheppard also seeks to bring an individual retaliation claim under Section 5J of the MFCA. There is little case law construing the MFCA's provisions. See Scannell v. Attorney Gen., 872 N.E.2d 1136, 1138 n.4 (Mass. App. Ct. 2007). But "the MFCA was modeled on the similarly worded Federal False Claims Act" ("FCA"), and therefore courts "look for guidance to cases and treatises interpreting the [FCA]" when interpreting the MFCA. Id.; cf. Univ. of Mass., Worcester, 80 F. Supp. 3d at 304 n.9 (describing scope of protected conduct under retaliation provisions of MFCA and FCA as "nearly identical").

As a preliminary matter, retaliation actions under the analogous FCA provision "need not meet the heightened pleading requirements of Rule 9(b)." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 238 n.23 (1st Cir. 2004) (interpreting a retaliation claim under 31 U.S.C. § 3730(h)), abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662 (2008). Furthermore, retaliation actions under the analogous FCA provision "are not subject to the [FCA] procedural requirements" of filing in camera and serving the government. United States ex rel. Pilo v. Martin Marietta Corp., 60 F.3d 995, 1000 (2d Cir. 1995). As

such, Sheppard's failure to meet the particularity requirement of Fed. R. Civ. P. 9(b), and her noncompliance with the procedural requirements of Mass. Gen. Laws ch. 12, § 5C(3), do not -- on their own -- make her motion to amend to include a retaliation claim futile.

The retaliation provision of the MFCA mandates that an employee shall be entitled to be made whole if she is terminated "because of lawful acts done by the employee . . . in furtherance of an action under [the MFCA], or other efforts to stop a violation of [the MFCA]." Mass. Gen. Laws ch. 12, § 5J(2). Thus, to prove a retaliatory termination, a plaintiff must demonstrate that (1) she engaged in conduct protected by the MFCA; (2) her employer knew that she was engaged in that conduct; and (3) her employer took an adverse employment action against her because of the protected conduct. See Maturi v. McLaughlin Research Corp., 413 F.3d 166, 172 (1st Cir. 2005) (citing Karvelas, 360 F.3d at 235) (setting out elements of a retaliation claim under the FCA).

As to the first element, the First Circuit has interpreted the analogous FCA provision to protect only that conduct "that 'reasonably could lead' to an FCA action." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 59 (1st Cir. 2017) (quoting Karvelas, 360 F.3d at 237). Internal reporting and objecting to employer directives fall within the scope of protected conduct

11

if they are related to the submission of false claims. See id.
at 59 n.8; United States ex rel. Lokosky v. Acclarent, Inc., 270
F. Supp. 3d 526, 533 (D. Mass. 2017). The second element -- the
employer's knowledge -- can be established with any action by
the employee that would give the employer notice that an FCA
action is "a reasonable possibility." Maturi, 413 F.3d at 173.
Finally, if a plaintiff is able to make an initial showing of
causation for the third element, the burden will shift to the
defendant to state a legitimate, nonretaliatory reason for the
termination. See Harrington v. Aggregate Indus. N.E. Region,
Inc., 668 F.3d 25, 31 (1st Cir. 2012) (holding that McDonnell
Douglas burden-shifting framework applies to FCA retaliation
claims). If the defendant articulates such a reason, the
plaintiff has the additional burden of showing that the reason
is mere pretext for retaliation. Id.

On its face, Sheppard's proposed amended complaint pleads
all of the elements of a retaliation claim under Mass. Gen. Laws
ch. 12, § 5J. See, e.g., Docket No. 61-1 ¶¶ 48-64. She alleges
that she complained about possible Medicaid fraud to her
supervisors and was subsequently suspended and terminated
because of that protected conduct. See, e.g., Docket No. 61-1 ¶¶
48-64. But the Court must, at this juncture, go further and
determine whether those allegations are supported by

"substantial evidence" in the record or are futile. Hatch, 274 F.3d at 19.

First, there is evidence in the record that Sheppard was engaged in protected conduct in the autumn of 2014. Sheppard produced an email from Stephen Hopkins to Silvia, dated October 31, 2014, which states that Sheppard "said that [Morris] has been going through the Medicaid charts and taking out documents that conflict with nursing as far as reimbursement so she doesn't lose points on the audit." Docket No. 51-13. Under First Circuit law, this internal reporting qualifies as protected conduct. See Booker, 847 F.3d at 59 n.8; Karvelas, 360 F.3d at 236-37. In addition, Sheppard's letter in response to her suspension, dated December 8, 2014, expressed her concern that managers retaliated against her "because [she] would not agree to the 'overscoring' of certain residents." Docket No. 51-11 at 2. When asked at her deposition when she first experienced retaliation, Sheppard testified: "When [Morris] wanted me to do the MMQ stuff and I told her no, the upscoring, I won't do it." Sheppard Dep. at 56:2-7. The conversation between Sheppard and Morris in which Sheppard resisted upscoring occurred in October or November 2014. Sheppard Dep. at 56:2-20. Objecting to employer directives regarding the submission of false claims is protected conduct. See Booker, 847 F.3d at 59 n.8. Sheppard's internal complaints of Morris's manipulation of Medicaid charts

and Sheppard's objections to Morris's upscoring in the autumn of 2014 substantially support an allegation of protected conduct.

Second, there is evidence that Sheppard's supervisors knew of her protected conduct. Employees whose "job responsibilities involve overseeing government billings or payments" face a heightened burden for notifying their employers that they are engaged in protected conduct. Maturi, 413 F.3d at 173. It is undisputed that Sheppard's job involved reviewing documentation for government reimbursement purposes. See Sheppard Dep. at 99:19-101:13. She sent biweekly emails to the administrator, director of nurses, and unit managers to report "[m]issing documentation" and "inaccurate documentation" in the files she reviewed. Sheppard Dep. at 99:19-101:13.

But there is evidence that Sheppard's supervisors knew that, by autumn 2014, she was reporting suspected instances of Medicaid fraud, not just missing or inaccurate documentation. The most important evidence is the email from Hopkins to Silvia, which outlined Sheppard's reports of Morris's intentional concealment of Medicaid records on October 31. See Docket No. 51-13. In her interrogatory responses, Sheppard stated that Zarella told her "not to put any of her findings in an email as the company was being audited by the Massachusetts Attorney General's Office[] for Medicaid fraud," Docket No. 51-5 at 17, indicating that Zarella was aware of Sheppard's complaints and

14

the danger they posed for Essex.[2] Moreover, Essex knew about Sheppard's allegations of fraud and resistance to upscoring by December 8, 2014, at the very latest. <u>See</u> Docket No. 51-11. This was after Sheppard's suspension, but prior to her termination.

Because Sheppard directly accused Morris of upscoring to multiple supervisors at Essex, there is admissible record evidence to support a finding that Sheppard satisfied the notice requirement. <u>See</u> <u>Dineen v. Dorchester House Multi-Serv. Ctr., Inc.</u>, No. 13-12200-LTS, 2015 WL 3616087, at *2 (D. Mass. June 9, 2015) (denying summary judgment where plaintiff presented admissible evidence that she told community health center's president that center's "Medicare Part B billing constituted fraud").

Finally, the record supports Sheppard's proposed amended allegation that she was suspended and terminated because of her protected conduct. According to the record, Sheppard engaged in protected conduct in October or November 2014. <u>See</u> Sheppard Dep. at 56:2-20; Docket No. 51-13. She was presented with a PIP on November 18, 2014. Docket No. 51-9. She was then suspended on December 5, 2014, Docket No. 51-10, and subsequently terminated on January 5, 2015, Docket No. 51-14. Causation can be inferred

---

[2]    Zarella does not refute Sheppard's interrogatory response in her affidavit. <u>See</u> Docket No. 51-1.

from temporal proximity between protected conduct and an adverse employment action. See Harrington, 668 F.3d at 32. A one- to two-month period is sufficiently brief to allow that inference. See Lokosky, 270 F. Supp. 3d at 534-35 (denying motion to dismiss when complaint alleged retaliation occurred four to six months after protected conduct). Sheppard's proposed amended complaint is supported by sufficient record evidence to make out a prima facie case.

Essex has presented facts to support a legitimate, nonretaliatory reason for Sheppard's suspension and termination: poor performance. See Docket No. 51-1 ¶¶ 16-27; Docket No. 51-14. But there are also facts in the record that indicate Essex's proffered reason is pretextual. See Harrington, 668 F.3d at 31. "[D]eviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events" can demonstrate pretext. Id. at 33. Here, Sheppard received a PIP roughly one month after her protected conduct. What is more suspicious, however, is that Essex barely gave her any time to improve her performance. As a result of deficiencies observed during an audit on November 30, 2014 -- just twelve days after the PIP was issued -- Sheppard was "re-educated on the process for completing and correcting the monthly nursing summaries." Docket No. 51-1 ¶ 23. But she did not have time to put that re-

education into action: Sheppard was suspended only five days later. Docket No. 51-1 ¶ 27. On the record as a whole, temporal proximity and a lack of any meaningful opportunity to remedy job performance could support an inference of pretext. See Dineen, 2015 WL 3616087, at *1.

Essex conducted an investigation into Sheppard's complaints of fraud by Morris and found that "there had not been any inappropriate conduct by Ms. Morris and that Ms. Sheppard's claims were unsubstantiated." Docket No. 51-1 ¶¶ 28-34. But even if the company believed that there was no actual fraud by Morris, the investigation's findings do not resolve Sheppard's retaliation allegations. See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 (2005) (stating that plaintiff "need not allege that the defendant submitted a false claim" to state FCA retaliation claim).

This Court therefore finds that Sheppard's proposed retaliatory suspension and termination claim under the MFCA would not be futile.

## III. **Motion for Summary Judgment**

Because the Court allows Sheppard to amend her complaint as described above, Essex's motion for summary judgment on the common-law wrongful termination claim is moot and will be denied.

**<u>ORDER</u>**

Plaintiff's motion to amend (Docket No. 61) is **<u>ALLOWED</u>** with respect to the retaliatory suspension and termination claim only. Defendant's motion for summary judgment (Docket No. 49) as to the claim of wrongful termination in violation of public policy is **<u>DENIED AS MOOT</u>**. Any claims against Beth Fearon, Frank Silvia, or HealthBridge Management Company are dismissed for lack of service.

**An initial pretrial conference will be held on March 29, 2018 at 11:00 a.m.**

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge